**SAN FRANCISCO TOMORROW et al.,
Appellants,**

v.

**George ROMNEY et al., Appellees.**

**No. 72–1969.**

United States Court of Appeals,
Ninth Circuit.

Jan. 18, 1973.

Rehearing Denied March 28, 1973.

J. Anthony Kline (argued), Robert L. Gnaizda, Jo Ann Chandler, Public Advocates, Inc., San Francisco, Cal., James Moorman, Sierra Club Defense Fund, San Francisco, Cal., for appellants.

Henry J. Bourgignon (argued), Jacques B. Gelin, Atty., Erwin Griswold, Sol. Gen., Washington, D. C., Michael A. DiSanto (argued), Henry F. Davis, San Francisco, Cal., James L. Browning, Jr., U. S. Atty., Francis B. Boone, Asst. U. S. Atty., San Francisco, Cal., for appellees.

Before CHOY and WALLACE, Circuit Judges, and McGOVERN,* District Judge.

McGOVERN, District Judge:

By Complaint filed January 13, 1972, plaintiff individuals, community and environmental organizations alleged that the United States, through Housing and Urban Development Secretary George Romney, had illegally approved and financed the Yerba Buena Center Redevelopment Project in San Francisco and the West Berkeley Industrial Park Redevelopment Project in Berkeley, California. Plaintiffs' claims were premised upon the theory that the Secretary of Housing and Urban Development (hereafter HUD) had failed to file for each project an Environmental Impact Statement as required by Section 102(2)(C) of the National Environmental Policy Act (NEPA), 83 Stat. 853, 42 U.S.C. § 4332, which provides:

"The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall * * *

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce en-

* The Honorable Walter T. McGovern, United States District Judge for the Western District of Washington, sitting by designation.

vironmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes."

The trial court, 342 F.Supp. 77, denied plaintiffs' Motions for Preliminary Injunction and Summary Judgment, and on May 3, 1972, granted the Motion of the Federal defendants to dismiss the Complaint. This Appeal followed. Appellants' Motion for Injunction pending the Appeal was denied by this Court on June 16, 1972, but thereafter granted by Justice William O. Douglas on June 26, 1972.

The West Berkeley Project consists of a 20-block area in West Berkeley along the eastern edge of the Eastshore Freeway. When renewed as planned, the area will enclose primarily commercial buildings and other facilities intended for industrial purposes. The project was contemplated originally to be part of a federal urban renewal program, but subsequently was converted to a Neighborhood Development Program. On February 10, 1970, HUD entered into an agreement with the Berkeley Redevelopment Agency and approved a Neighborhood Development Project grant of $961,332 for the first action year of the project. A second action year grant was subsequently approved on June 3, 1971 and a third action year application for grant and loan is now pending.

San Francisco Yerba Buena Project consists of 87 acres in the City and County of San Francisco and is bounded generally by Second and Fifth Streets on the east and west and Market and Harrison Streets on the north and south. As currently planned, the presently blighted area will have new commercial buildings, parking facilities for 4,000 automobiles, a convention center, a large hotel and other facilities. On December 2, 1966, HUD executed a loan and grant contract[1] with the San Francisco Redevelopment Agency providing for a federal loan of $49,754,729, a project grant of $29,834,484 and a relocation grant of $1,320,795. On June 26, 1970, by an amendatory agreement, the relocation grant was increased by an additional $3,023,705. On April 28, 1972, by a second amendatory agreement the grants were increased by another $4,109,062.

These projects represent two types of HUD urban renewal projects which may qualify for federal financial assistance under the slum clearance and urban renewal provision of the Housing Act of 1949, 68 Stat. 622, as amended, 42 U.S. C. § 1450 et seq. The conventional Yerba Buena Center project is planned and funded as one unit, the other, the Neighborhood Development, or West Berkeley Industrial Park, project is funded in annual increments, and the Government may terminate the project at the end of any year.

The trial court concluded that the plaintiffs had no standing to challenge the projects because the plaintiffs' property or other legal interests in the project were neither greater nor lesser than those of other organizations or persons.

---

1. The provisions of the Housing Act of 1949, 42 U.S.C. § 1450 et seq., under which the Yerba Buena project comes, enable basically a contractual relationship between a locality and HUD. The locality must present a workable program for community improvement to HUD. HUD then reviews the proposed program and certifies the availability of federal assistance. § 1451(c). A loan or a grant, or both, may be made from the federal government to the locality. The Secretary may establish reasonable requirements for the program which must be complied with prior to the entering into a contract with the locality. These requirements operate as conditions precedent to the formation of the contract. § 1453. In implementing the program of urban renewal, which HUD monitors, the local agency must comply with the conditions of the contract. The Secretary of HUD can commence any action to enforce any right acquired by him under the contract. § 1456(c). This statutory scheme thus provides for local adoption of a plan, adjustment of the plan to meet HUD requirements and finally entry into an enforceable contractual relationship with HUD.

While it might properly be said that the Articles of Incorporation of the Sierra Club clearly indicate that its corporate purposes do not include suits, or activities, of the specific type here involved, yet it appears that the principal plaintiff, San Francisco Tomorrow, is not so corporately restricted. The Complaint alleges sufficiently that San Francisco Tomorrow has been adversely affected, at least in non-economic ways, by agency inaction under NEPA. That should be, and is, sufficient under case law to give San Francisco Tomorrow sufficient standing to sue. Sierra Club v. Hickel, 433 F.2d 24 (Ninth Circuit, 1970).

As for the Berkeley project, an individual plaintiff, William Walker, resides within the project area and has alleged sufficient environmental injury to be entitled to his day in Court.

We also note that the federal appellees here have changed their position on the question of standing, and now state in their brief on appeal: "Since it appears from the record that at least some of the plaintiffs have satisfied recent Supreme Court requirements for standing, the Government is not challenging standing before this Court."

The controversy before us should be decided by an examination of the facts, as is necessarily required in every NEPA case.

The National Environmental Policy Act became effective on January 1, 1970 and its terms are applicable to all agencies of the Federal Government which thereafter engage in further "major federal actions significantly affecting the quality of the human environment . . . .".

The Act does not by direct language or by implication call for retrospective application. In fact, the Council on Environmental Quality, the agency created by NEPA to enforce the Act, states in its interim guidelines of April 23, 1971 that existing federal projects and programs are affected only by *further* major action, as follows:

"11. Application of section 102(2)(C) procedure to existing projects and programs. To the maximum extent practicable the section 102(2)(C) procedure should be applied to *further* major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the Act on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program. (Emphasis added). 36 Fed. Register 7727."

Also see Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d, 613, 624 (Third Circuit, 1971).

The controlling question before us is whether or not subsequent to January 1, 1970, some further major action which would significantly affect the quality of the human environment, was required of the Federal Government in the development of either the Yerba Buena Center or the West Berkeley Industrial Park projects.

The chronological series of events pertaining to the Yerba Buena Center shed some light on the subject and are as follows:

September 5, 1962: HUD advanced funds to the San Francisco Redevelopment Agency in order that the latter might survey, study and prepare plans for the proposed urban area to be renewed.

December 1, 1964: The initial redevelopment plan was submitted to HUD.

December 7, 1965: The redevelopment plan was approved by the Redevelopment Agency Commissioners.

January 13, 1966: The redevelopment plan was approved by the San Francisco City Planning Commission.

April 25, 1966: The redevelopment plan was adopted by the City of San Francisco Board of Supervisors under Ordinance No. 98–66.

October 20, 1966: The redevelopment plan was approved by HUD for federal financing.

December 2, 1966: HUD signed a loan and grant contract with the San Francisco Redevelopment Agency, providing for a federal loan to the agency of $49,754,729, a federal project grant of $29,834,484 and a federal relocation grant of $1,320,795.

Urban renewal funds were committed to the project for limited purposes only. The Redevelopment Agency may use the funds to purchase the land within the renewal area, relocate the displaced residents, demolish buildings in the area, and provide for site grading streets and utilities. The funds may not be used for building construction and the Federal Government does not acquire or redevelop the properties.

When the National Environmental Policy act became effective on January 1, 1970, the federal involvement in the Yerba Buena Center project was virtually complete. In fact, for purposes of NEPA, major *federal* action had terminated on December 2, 1966 when HUD became contractually obligated to the San Francisco Redevelopment Agency for the loan and grants. The record before us shows no further major federal involvement subsequent to that time.

Appellants argue that the June 26, 1970 and April 28, 1972 amendatory grants to the San Francisco Redevelopment Agency and Hud's contractual right to monitor the project as it develops to assure compliance with statutory and contractual requirements constituted major federal actions subsequent to the passage of NEPA. We hold otherwise.

■ Amendatory contracts which increase the federal funding only to provide for the rising costs of land acquisition and relocation of displaced residents do not constitute "further major federal action" within the meaning of the Act. Instead, such amendments represent but confirmation of the Federal Government's earlier decision that the project proposal conformed to HUD requirements and was therefore eligible for a grant and loan. The major federal action was the execution of the initial grant and loan contract which occurred over four years before the effective date of NEPA. Monitoring the project only assures HUD that the undertakings of SFRA under its contract of December 2, 1966 will be fulfilled and involves no further major federal action.

Appellant's strong reliance on highway cases[2] in which courts have found major federal actions requiring environmental impact statments under NEPA is misplaced. We pointed out in Lathan v. Volpe, 455 F.2d 1111, 1116 (9th Cir. 1971) that "federal law establishes five stages in the construction of a federally financed highway: program, routing, engineering design, right-of-way acquisition, and actual construction." There we found that major federal action had occurred in the earlier stages even though federal approval of design or construction plans had not yet been given, and we held that before the later stages were reached the NEPA impact statement should be filed.

In this urban renewal case, however, the crucial federal action occurred when HUD contracted a loan and grants with the local agency in 1966. No further major stage requiring action by HUD having a significant effect on the environment has occurred since then.

■ It is otherwise, however, as to the West Berkeley Project. HUD's agreement of February 10, 1970 with the Berkeley Redevelopment Agency significantly changed an industrial park

2. E. g. Brooks v. Volpe, 460 F.2d 1193 (Ninth Circuit 1972), Arlington Coalition v. Volpe, 458 F.2d 1323 (Fourth Circuit 1972); Nolop v. Volpe, 333 F.Supp. 1364 (D.S.D.1971); Morningside-Lenox Park Association v. Volpe, 334 F.Supp. 132 (N.D.Ga.1971).

project to a neighborhood development program. This constituted major federal action. Since that date is subsequent to the effective date of NEPA, the project may go forward only upon compliance with the terms of the Act. cf. Businessmen v. D. C. City Council, 339 F. Supp. 793 (D.D.C., 1972)

The order of the trial court is affirmed as to the Yerba Buena Center Redevelopment Project in San Francisco and reversed as to the West Berkeley Industrial Park Redevelopment Project.